**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| KEJUAN JENKINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 24-cv-1488-DWD |
| | ) | |
| STEVEN REID, | ) | |
| TYLER PEDROLEY, | ) | |
| DALTON ROBERTS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

**DUGAN, District Judge:**

Plaintiff Kejuan Jenkins brings this action pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights while at Menard Correctional Center (Menard). Plaintiff alleged that the defendants violated the Eighth Amendment in relation to some events that transpired in the showers at Menard in April of 2024. Defendants moved for summary judgment (Doc. 80), Plaintiff responded (Doc. 84), and after finding there was a genuine dispute (Doc. 88) the Court scheduled an evidentiary hearing. At the hearing, the Court heard testimony from Plaintiff, a Menard counselor, a Menard grievance officer, a Menard PREA compliance officer, and an Administrative Review Board officer. In light of the testimony and evidence presented in this matter, the Court finds that Defendants have failed to carry their burden of demonstrating Plaintiff did not exhaust his administrative remedies.

BACKGROUND

Plaintiff signed his complaint on June 12, 2024, and it was received by the Court the same day.  (Doc. 1 at 7)  In the Complaint, Plaintiff alleged that in April of 2024 he was forced to shower in a communal area with homosexual inmates who participated in open sexual acts and attempted to persuade him to do the same.  He was uncomfortable with the situation and asked Defendants to address it, but they refused and pressured him to participate.  Ultimately, Plaintiff ended up in a physical altercation, which he alleges was necessary to stave off advances, and which he alleges staff did not attempt to mitigate.  Upon initial review of the pleading, Plaintiff was allowed to proceed on the following claims:

Claim 1:     Eighth Amendment cruel and unusual punishment claim against Defendant Reid related to the April 7, 2024, shower incident;

Claim 2:     Eighth Amendment cruel and unusual punishment claim against Defendants Pedroley and Roberts related to the April 8, 2024, shower incident;

Claim 3:     Eighth Amendment cruel and unusual punishment claim against Defendant Reid for the final April 2024 shower incident that resulted in a physical altercation;

Claim 4:     Failure to intervene claim against Defendant Reid for the April 2024 shower altercation; and

Claim 5:     State law negligence claim against Defendant Reid for the last April 2024 shower incident that resulted in  the altercation.

(Doc. 21).

In the Motion for Summary Judgment, Defendants argue that Plaintiff did not submit any relevant grievances, nor did he send any PREA reports or kites to the warden.

They support their position with grievance logs, a declaration from Menard's PREA coordinator, the Warden's kite log, and declarations from a grievance officer and counselor.

In response, Plaintiff argues that he attempted to submit multiple documents about the incident in April of 2024, but he had to place them in his cell bars for mailing, and he had no way of knowing if they were properly transmitted by prison staff.  He points to a grievance he submitted in 2023 about a medical issue that was not answered until more than a year later as proof of the slow nature of Menard's grievance process. Plaintiff included alleged copies of the various April grievances, as well as declarations from many fellow inmates about their ability to access sick call or to get responses to grievances.

The Court found that the dispute could not be resolved on paper because there was a material dispute about if Plaintiff did in fact attempt to submit grievances in April of 2024 that were lost or obstructed, or if he failed to submit anything before filing this lawsuit.  An evidentiary hearing was conducted on March 13, 2026.

### FINDINGS OF FACT

Plaintiff testified that he never received a Menard orientation manual and did not have any form of written instructions on the prison's grievance process.  He explained that he submitted multiple grievances beginning on April 7, 2024, about the incidents alleged in this lawsuit.  All grievances he submitted were marked as emergencies. Under the emergency process, the warden must first determine if the grievance will be processed as an emergency or not.  If emergency status is granted, the grievance

automatically goes to the next level of review, but if it is denied, the inmate must submit the grievance again via the normal process.  Plaintiff's only option to submit grievances in his housing situation was to place them in his cell bars for staff to collect and distribute.

Plaintiff testified that inmates were not allowed to get copies of their grievances until they came back from the first level of review.  For this reason, it was his own practice to request multiple grievance forms and to pen his own duplicate copies at the time he prepared grievances for submission.  He testified that usually an emergency grievance would get a response within a week or so about if the warden deemed it an emergency or not, but he never got a response to the April grievances he filed as emergencies.  He testified that in November of 2024, he resubmitted a copy of his earlier April 7, 2024, grievance to try and get acknowledgment of his overall grievance efforts.

Plaintiff testified that Counselor Smith makes rounds in the cellhouse once a month, but during rounds she does not make a point to stop at everyone's cell.  He indicated that if you are not awake early in the morning when she comes around, you may miss her because she is there and gone quickly.  Plaintiff believes that staff at Menard are a close-knit community and that if an inmate submits a grievance they do not like, they will simply discard it.  He stated that he spoke to Smith only about his protective custody status, but then admitted he also spoke to her about job placement.

Caly Smith, Plaintiff's correctional counselor during the relevant timeframe at Menard testified about her cellhouse rounds.  She testified that she visits the cellhouse every 30 days, and during a visit she will speak to offenders about a wide variety of things.  Smith will make notes in the CHAMPS counseling log about inmate encounters

when she returns to her office.  She reviewed the CHAMPS notes for the hearing and testified that based on the notes she saw Plaintiff on April 2 and 12, May 2, June 5 and 11, and July 3, 2024.  During these encounters she does not recall Plaintiff asking about grievances or reporting any PREA issues.  However, she knows she assisted with Plaintiff's requests for a job and housing reclassification, which were both denied.

Lance Phelps, a grievance officer at Menard, testified that grievances are either collected by staffing walking around and gathering them by hand, or by staff bringing around a portable grievance box.  Once a grievance is received by the grievance office, it is logged in an internal log, and a CHAMPS receipt is created for the inmate.  If the grievance is marked an emergency, it is transmitted to the warden for an initial determination of emergency status.  If it is not an emergency, the person who logs the grievance will transmit it to the appropriate initial level of review.  If a grievance is eligible for initial review by the counselor, it will get a response, and the inmate then has 14 days to appeal to the grievance officer.  Once a grievance officer reviews a grievance, it is forwarded to the Chief Administrative Officer for a final signature on the proposed disposition.  An inmate has 30 days to appeal a grievance to the final level of review. Phelps testified that every inmate gets an orientation manual on arrival that describes the grievance process, though he did not know if Plaintiff received a manual.  Phelps agreed that a cellhouse lockdown can last anywhere from a day to a month, and that during that time inmates cannot leave their cells to access physical grievance boxes.

Sheri Buettner, a PREA compliance officer, testified that an individual can lodge a PREA report via many channels, including a verbal report to staff, or via a grievance or

kite. If a PREA report is received, internal affairs is contacted to make an initial assessment of the situation. If internal affairs deems the report credible, then an investigation and multiple follow-up contacts with the inmate will ensue, but if they do not deem a report credible nothing further happens. Buettner testified that Plaintiff was interviewed by internal affairs in December of 2024, but they determined his report did not meet criteria and nothing further happened. She was not the PREA coordinator from April to June of 2024, and she does not know if he made reports during that time, or how they were handled.

Administrative Review Board (ARB) member Ryan Nothnagle testified that the ARB did not receive any grievance appeals from Plaintiff between April and June of 2024. He indicated that if inmates send correspondence other than an appeal, it is logged, but he did not explain where this log is kept or if any responses are sent to this correspondence.

CONCLUSIONS OF LAW

A. Legal Standards

Summary judgment is proper if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable [factfinder] could [find] for the nonmoving part." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Prison Litigation Reform Act (PLRA) provides that a prisoner may not bring a lawsuit about prison conditions unless and until he has exhausted all available administrative remedies. 42 U.S.C. § 1997e(a); *Pavey v. Conley*, 544 F.3d 739, 740 (7th Cir.

2008). "The exhaustion requirement is an affirmative defense, which the defendants bear the burden of proving." *Pavey v. Conley*, 663 F.3d 899, 903 (7th Cir. 2011).

Historically speaking, courts in the Seventh Circuit have resolved the issue of exhaustion of administrative remedies on paper, or after an evidentiary hearing if there is a genuine dispute of fact. *See e.g.*, *Smallwood v. Williams*, 59 F.4th 306, 315 (7th Cir. 2023) ("In this circuit, we have determined that disputed factual questions that bear on exhaustion can be resolved by a district court judge (rather than a jury) as a preliminary matter, in what is known as a *Pavey* hearing."). In *Perttu v. Richards*, 145 S.Ct. 1793, 1800 (June 18, 2025), the Supreme Court held that an inmate is entitled "to a jury trial on PLRA exhaustion when that issue is intertwined with the merits of a claim that falls under the Seventh Amendment."[1]

An "available" remedy is one that is "capable of use for the accomplishment of a purpose" and "is accessible or may be obtained." *Crouch v. Brown*, 27 F.4th 1315, 1320 (7th Cir. 2022) *citing* *Ross v. Blake*, 578 U.S. 632, 642 (2016). If availability is at issue, the Court must resolve that issue before proceeding to the merits of the exhaustion dispute. *Wallace v. Baldwin*, 55 F.4th 535, 539 (7th Cir. 2022) (the district court must first consider the threshold question of if exhaustion was available). There are three circumstances that might support a finding of unavailability: (1) a process may be unavailable if it is so opaque that it becomes incapable of use; (2) a process may be unavailable if administrators thwart an inmate from using it via machination, misrepresentation, or

---

[1] In this case, *Perttu* does not apply because there is no intertwinement between the exhaustion issues and the merits of the underlying claim. Plaintiff does not allege the defendants personally interfered with his access to the grievance process, and he does not suggest retaliation.

intimidation; or, (3) a process may be unavailable if it operates as a "dead end" with officers unable or consistently unwilling to provide any relief for aggrieved inmates. *Ross v. Blake,* 578 U.S. 632, 643-44 (2016). In *Dole* and *Gooch,* the Seventh Circuit considered situations where a process was unavailable due to acts or misrepresentations by prison administrators. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006) (finding that an inmate did all he could to exhaust a grievance when he placed the appeal in his cell bars for mailing, but it got lost and he had no direction on what to do about a lost grievance); *Gooch v. Young*, 24 F.4th 624 (7th Cir. 2022) (finding the grievance process was unavailable where prison staff threatened Plaintiff and refused to give him the appropriate grievance form). "If prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting," then the grievance procedure becomes unavailable. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006) (finding that an inmate who placed a timely ARB appeal in his chuckhole for mailing, but whose grievance was apparently lost, did all that he could to follow exhaustion procedures).

As an inmate in the Illinois Department of Corrections (IDOC), Plaintiff must follow the grievance process outlined in the Illinois Administrative Code. 20 ILL. ADMIN. CODE § 504.800, et seq. (2017). Under IDOC's procedure, an inmate initiates a grievance with his counselor within 60 days of an event, and he may then submit his grievance to a grievance officer at his facility, and to the CAO at his facility. If an inmate is unsatisfied with the outcome at the facility he must appeal to the ARB within 30 days. 20 ILL. ADMIN. CODE § 504.850(a).

B. Analysis

The burden is on the Defendants to establish that the grievance process is available. After hearing testimony and reviewing the documentary evidence, the Court finds that the Defendants have not credibly established availability of the grievance process in this case. Although Officer Phelps testified that all inmates are provided with an orientation manual that explains the grievance process, Plaintiff testified that he was told generally about the existence of a manual at orientation, but that he was never provided with a copy. Plaintiff and Phelps both testified that in Plaintiff's living situation, it was conceivable that his only way to deposit a grievance may have been to place it in his cell bars or to hand it directly to an officer who was circulating the gallery for placement in the grievance box. Plaintiff testified that he submitted three or four emergency grievances in April of 2024, which aligns precisely with the exhibits to his summary judgment response.

He testified that when an emergency grievance goes to the Warden, a receipt should be generated, and generally within a week an inmate learns if the Warden deemed the grievance an emergency or a non-emergency. Plaintiff understood that if the grievance was deemed non-emergency, it would be his responsibility to submit it again for normal processing. However, with his April 2024 grievances he claims he never got acknowledgement that they were received or reviewed by the Warden. Plaintiff testified that inmates are not allowed to make copies of their grievances until they get the first round of responses, so his only way to keep records was to request multiple grievance forms and to make his own handwritten copies. No one testified about the specific

process an inmate is supposed to use if he believes a grievance comes up missing. There was also no written documentation tendered about this issue.

Counselor Smith testified that she visited Plaintiff's cellhouse multiple times between April and June of 2024. The CHAMPS counseling summary submitted with the written motion for summary judgment (Doc. 80-4 at 1-2) depicted these encounters. The counseling summary said Plaintiff reported no issues, and Smith testified that she did not recall talking to Plaintiff about any PREA issues or grievances. Smith indicated in testimony that it is her practice to note inmate concerns in the CHAMPS notes, but that she makes her notes when she returns to her office. On his own account, Plaintiff testified that sometimes the 30-day rounds that Smith makes are brief, and she does not always speak to all inmates. There was no information given about how many inmates are in each cellhouse, or how Smith keeps track of inmate conversations between the time they occur and when she returns to enter her notes.

Factually, even after the evidentiary hearing, this case remains a close call. However, the burden is on the defendants to establish the availability of remedies, and in this case, the Court finds that they have not met that burden. It remains an open question if Plaintiff was ever instructed on what he might do if a grievance was lost or did not get a response. An inmate must be informed of the grievance process in order for it to be found available. *See e.g., Ramirez v. Young,* 906 F.3d 530, 538 (7th Cir. 2018) ("Prisons must affirmatively provide the information needed to file a grievance."). It is also questionable whether the CHAMPS notes from gallery tours are the best account of what transpired if the counselors do not take contemporaneous notes while visiting with

the inmates. Additionally, it is concerning in this case that testimony suggested staff may sometimes hand collect grievances rather than circulating a locked grievance box when inmates are not allowed to leave their cells. Given Plaintiff's undisputed testimony that sometimes cellhouses are on complete lockdown for 30 days, it is feasible that he could have tried to hand submit grievances only for them to be lost or intentionally destroyed.

The Court is not suggesting that it found any of the witnesses to be explicitly untruthful in this case, but the bigger problem is the overall poor grievance system at Menard. The lack of an accurate and thorough receipt and grievance documentation system continues to be an issue in cases filed by Menard inmates. If inmates are not allowed to make copies of grievances until the prison processes them through an entire level of review, and if they do not get instantaneous receipts when they deposit a grievance for filing, it is often difficult to resolve a dispute like the one before the Court in this case. The undersigned is required to conduct many Pavey hearings solely because Menard continues to maintain a poor record-keeping system for grievance documentation, and because it seemingly does not clearly communicate the procedures and expectations to inmates. Until this systemic problem is resolved, Pavey hearings of this nature will continue to consume court resources. Given that the defendants did not meet their burden of showing that Plaintiff was informed of the system, that he had an ability to check on the status of grievances, or that he did not submit any in April of 2024, their motion on the affirmative defense of failure to exhaust is denied.

### DISPOSITION

The Defendants failed to meet their burden of proof to demonstrate that the grievance process was available for Plaintiff's grievances in April of 2024.  A merits summary judgment schedule shall follow.

**IT IS SO ORDERED.**

Dated: March 16, 2026

_____
DAVID W. DUGAN
United States District Judge